Todd NEWMILLER, Petitioner–
Appellant,

v.

Rick RAEMISCH, Executive Director, Colorado Department of Corrections; Cynthia Coffman, Attorney General, State of Colorado, Respondents–Appellees.

No. 16-1396

United States Court of Appeals, Tenth Circuit.

FILED December 18, 2017

Gail K. Johnson, Johnson, Brennan & Klein, PLLC, Boulder, Colorado, for Petitioner–Appellant.

Ryan A. Crane, Senior Assistant Attorney General, Criminal Appeals Section (Cynthia H. Coffman, Attorney General, with him on the brief), Office of the Colorado Attorney General, Denver, Colorado, for Respondents–Appellees.

Before TYMKOVICH, Chief Judge, SEYMOUR, and McHUGH, Circuit Judges.

McHUGH, Circuit Judge.

The genesis of this appeal is a murder committed during an altercation outside a strip club in Colorado Springs, Colorado. Petitioner Todd Newmiller and several of his friends went to the club to celebrate Mr. Newmiller's birthday. After leaving the club, they had a fight with another group of men, during which Mr. Newmiller fatally stabbed Anthony Madril in the heart. Mr. Newmiller was then charged and convicted of second-degree murder, and sentenced to thirty-one years' imprisonment. The Colorado Court of Appeals (CCA) affirmed his conviction and sentence. The Colorado Supreme Court denied certiorari review. Mr. Newmiller later challenged the constitutionality of his conviction under Colorado Rule of Criminal Procedure 35(c). After an evidentiary hearing, the state post-conviction court denied relief. The CCA affirmed the denial. And the Colorado Supreme Court again denied certiorari review.

Mr. Newmiller next sought habeas relief in federal district court pursuant to 28 U.S.C. § 2254. He argued his trial counsel were ineffective in violation of the Sixth Amendment because they failed to investigate, challenge, and rebut the prosecution's expert medical testimony. The district court ruled trial counsel's performance was deficient and the CCA's conclusion to the contrary was an unreasonable application of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). But the district court denied relief because Mr. Newmiller failed to show counsel's performance was prejudicial. Mr. Newmiller now appeals. Exercising jurisdiction under 28 U.S.C. §§ 1291 and 2253, we affirm.

To place our analysis in context, we begin with a robust overview of the facts. We then provide relevant procedural details, beginning with Mr. Newmiller's trial in state court. Next, we summarize the proceedings before the state post-conviction court, that court's ruling on Mr. Newmiller's petition, and the CCA's decision on appellate review. Last, we discuss the federal district court's ruling denying habeas relief.

After completing our review of the factual and procedural history, we address the merits of the district court's denial of habeas relief. Although we agree that Mr. Newmiller is not entitled to relief, we extend appropriate deference to the state court and thus leave undisturbed the CCA's conclusion that trial counsel's performance was not deficient. As a result, we do not reach the prejudice prong of the ineffective-assistance-of-counsel inquiry on which the district court's denial of relief was based.

## I. BACKGROUND

### A. Factual History

Mr. Newmiller, his brother, Joel New-

miller,[1] and their friends, Brad Orgill, Jason Melick, and Michael Lee (the Newmiller group), went to a strip club in Colorado Springs to celebrate Mr. Newmiller's birthday. *See People v. Newmiller*, 338 P.3d 459, 461 (Colo. App. 2014). As members of the Newmiller group were leaving the club, they had an argument with another group of men also leaving the venue. *Id.* The other group consisted of Mr. Madril, Chisum Lopez, and Charles Schwartz (Mr. Madril's group). *Id.*

"Both groups eventually left the club in separate vehicles. About a half block away, [Mr. Madril's] group stopped its pickup truck in the middle of the street." *Id.* As the Newmiller group's Jeep approached the pickup truck, Mr. Newmiller jumped out and ran toward the truck. Joel then parked the Jeep, and Mr. Orgill exited the vehicle, followed by Mr. Melick, Mr. Lee, and Joel. Mr. Lee testified at trial that at least one person from Mr. Madril's group had exited the pickup truck and squared off to fight Mr. Newmiller. But Mr. Lee could not identify who that person was. He testified that he lost track of Mr. Newmiller early in the confrontation.

The two groups confronted each other, and at some point Mr. Madril was stabbed in the heart. *Id.* Mr. Madril and Mr. Orgill also engaged in a fight lasting "30 seconds to a minute." During that fight, Mr. Madril initially knocked Mr. Orgill to the ground. But Mr. Madril soon became "less ... resistan[t]" and actually fell down onto Mr. Orgill. Mr. Orgill testified that the fight "was over really quick."

According to the surviving participants, the entire incident lasted somewhere between a minute and a half and two minutes. Afterward, everyone fled the scene. *Id.* Mr. Madril's group "headed to the hospital but pulled over when the 911 dispatcher told them to wait for an ambulance. [Mr. Madril] was transported to the hospital by ambulance and pronounced dead on arrival." *Id.*

The next day, Mr. Melick, a member of the Newmiller group, "learned that someone had been killed in the same area where the fight had occurred. He placed an anonymous phone call to the police and named [Mr. Newmiller] as the killer." *Id.* Police then arrested Mr. Newmiller. *Id.* A search of Mr. Newmiller's person uncovered a knife. *Id.* "Forensic testing revealed a small amount of blood matching [Mr. Madril's] blood on the blade of the knife." *Id.*

## B. Trial

Mr. Newmiller was charged with and tried for second-degree murder. *Id.* "He did not testify at trial, but everyone else involved did. Although there were substantial inconsistencies in the testimony," the testimony and evidence established that no one saw Mr. Newmiller stab Mr. Madril or any of the participants with a weapon before or during the altercation. *Id.* The evidence also confirmed that Mr. Orgill fought Mr. Madril and established that Mr. Newmiller verbally argued with Mr. Lopez. *Id.* It was also "uncontested that [Mr. Newmiller] stabbed one of the truck's tires right before [Mr. Madril's] group drove away." *Id.*

As summarized by the CCA,

The prosecution's theory of the case was that [Mr. Newmiller] stabbed [Mr. Madril] at the very beginning of the confrontation and [Mr. Madril] remained alive for several minutes after he had been stabbed. The prosecution had to

---

1. To avoid confusion we refer to the defendant, Todd Newmiller, as Mr. Newmiller, and to his brother, Joel Newmiller, as Joel.

establish that [Mr. Newmiller] stabbed [Mr. Madril] then because other than during the first few seconds after [Mr. Newmiller] and [Mr. Madril] left their respective vehicles, someone from [Mr. Madril's] or [Mr. Newmiller's] group saw either [Mr. Madril] or [Mr. Newmiller] at all times, and no one saw them near each other. The prosecution thus had to show that [Mr. Madril] lived for some time after he was stabbed, during which time he fought with [Mr.] Orgill. In support of its theory, the prosecution offered testimony from Joel Newmiller . . . , [Mr.] Melick, [Mr.] Orgill, and [Mr.] Lee. Joel testified that when [Mr. Newmiller's] group got back in the Jeep after the fight, he became upset after seeing a cut on his brother's ( [Mr. Newmiller's] ) face. Joel testified that [Mr. Newmiller] attempted to calm him down by saying, "[d]on't worry about it. I slashed their tire and I stabbed one of them." [Mr.] Melick also testified that Joel started "freaking out" because [Mr. Newmiller] had been hit; in response, [Mr. Newmiller] said to Joel, "[d]on't worry. Don't worry, I stabbed him." [Mr.] Melick testified that [Mr. Newmiller] then said to the other occupants of the vehicle, "I stabbed the guy, okay?" and "[y]ou guys don't know nothing about this, okay?"

[Mr.] Orgill and [Mr.] Lee testified that they did not hear [Mr. Newmiller] say anything at that time about stabbing anyone; however, they both testified that when the three of them were at [Mr.] Orgill's house later that night, [Mr. Newmiller] said something like he hoped he had not stabbed anyone or he thought he might have stabbed someone. [Mr.] Orgill, [Mr.] Lee, and [Mr. Newmiller] looked at [Mr. Newmiller's] knife, but no blood was visible.

[Mr.] Orgill's clothes were covered heavily in blood. [Mr. Newmiller] also had some blood on his clothing. As a result, both [Mr.] Orgill and [Mr. Newmiller] burned their clothes.

*Id.* at 461–62 (footnote omitted).

The prosecution also relied on the expert medical testimony of Dr. George Hertner and Dr. Donald Ritchey. Dr. Hertner is an emergency room physician who examined Mr. Madril when Mr. Madril arrived dead at the hospital. *See id.* at 466. Dr. Hertner testified he sees about one hundred trauma patients per year and at least ten patients per year who have a wound to the heart. Dr. Hertner explained death is not always instantaneous when an individual suffers a wound to the heart. And he averred that he has seen people stand and walk around after suffering a stab wound to the chest. He testified that it would not surprise him if a person could stay on his feet for one or two minutes after being stabbed in the heart, in part, due to adrenaline's ability to mask the pain and temporarily compensate for blood loss.

As for Mr. Madril's chest wound, Dr. Hertner described it as a "three-inch long laceration," i.e., "a big cut." He testified that he performed an ultrasound on Mr. Madril that showed Mr. Madril "had a large amount of blood in the left side of his chest and possibly around his heart," preventing him from having any cardiac or brain activity. "Basically," Dr. Hertner attested, Mr. Madril "bled out into his chest." Dr. Hertner explained that in this type of situation the blood inside the chest pushes against the lung and prevents the lung from expanding and the heart from beating. He further testified that how rapidly someone perishes after suffering this type of wound depends on several factors, including the size of the wound, whether the person was active at the time he suffered the wound, and the person's blood pressure. And Dr. Hertner testified that

the rate at which someone loses blood may be influenced by the pericardium, which is the "sac that surrounds the heart." Dr. Hertner explained that when someone has a hole in his heart, he also usually has a hole in his pericardium. In that case, the heart bleeds into the space between the heart and the pericardium, which may slow the flow of blood and thus the rate at which the patient bleeds out. That said, Dr. Hertner admitted he had "no idea" how long Mr. Madril lived after being stabbed.

Dr. Ritchey is a forensic pathologist who performed Mr. Madril's autopsy. *Newmiller*, 338 P.3d at 466. Dr. Ritchey testified that Mr. Madril's wound entered the apex of his heart and punctured a hole in his heart. He further testified that two liters of blood had accumulated within the thoracic cavity. And he testified that it was "extremely likely" Mr. Madril experienced "cardiac tamponade," wherein blood fills in the pericardium surrounding the heart and slows the flow of blood. Dr. Ritchey explained that cardiac tamponade can extend a person's life up to fifteen to twenty minutes after being stabbed, as opposed to dying within one minute. But Dr. Ritchey admitted he arrived at this conclusion based "predominantly on the fact that [Mr. Madril] is known to have lived for some period of time after he was stabbed." And he acknowledged that he had "no way of knowing" exactly how long Mr. Madril lived after being stabbed, and that a person could die from such a wound in anywhere from "a few seconds to a few minutes."

Mr. Newmiller's counsel, Deborah Grohs and Philip Tate, did not cross-examine Dr. Ritchey about his cardiac tamponade theory. Nor did they call a witness to rebut the testimony provided by either Dr. Hertner or Dr. Ritchey.

On March 8, 2016, the sixth day of witness examination, Ms. Grohs informed the court that she had just received a significant amount of discovery from the prosecution. She stated that Mr. Tate's assistant received a call from the prosecution on March 6, 2016, and then retrieved the materials the next day. The materials included interviews with witnesses who had already testified and with witnesses who had not yet testified. The materials also included the prosecution's interview with Dr. Andrew Berson, a report from Dr. Hertner, and a report from Dr. Ritchey. After the trial court berated the prosecutors for failing to produce these materials in a timely fashion, Ms. Grohs moved for a mistrial.

But before the court ruled on the motion for a mistrial, it became evident that the prosecution actually had made the relevant discovery materials available by February 28, 2006, the day jury selection started. The prosecution explained that although they notified Mr. Tate's assistant that afternoon, she did not collect the materials until March 7, 2016. After realizing her error, Ms. Grohs apologized to the court for accusing the prosecution of wrongfully delaying disclosure of the materials. The court denied the motion for a mistrial.

In its closing remarks, the prosecution argued that Mr. Madril was able to fight Mr. Orgill after being stabbed due to a rush of adrenaline. The prosecution stated:

> You heard from the doctors that [a] stab wound with that adrenalin running, he might not have even known or maybe he did. Maybe he knew that he'd been stabbed, but he had no time to do anything because as the defendant's running past him, he's pushing him and Brad Orgill is right there and Brad Orgill and Anthony Madril begin their fight. . . .

You heard from the witnesses that about midway through the fight Anthony Madril started to slow, started to lag, started to look tired, wasn't hitting back, fell down.

Well, folks, that was because he'd already been stabbed in the heart. And as you heard from the doctors, after those few seconds of adrenalin rush, after the heart begins to leak, that's when he would start to fade, and that's exactly what happened. He was able to stay on his feet, just as the doctors told you, for a few minutes, a few seconds. He was able to fight because the nature of the wound, there was still heart—or, I'm sorry, still blood pumping through his veins, pumping to his brain. Because of the fact that the one ventricle was in front of the other, there was blood still going to the aorta. You heard that from Dr. Ritchey. You have the diagram where he explained that to you.

You heard from both the doctors, stab victims don't just fall down the second it happens. They stay on their feet. That's perfectly reasonable and it happens often. The nature of that wound with the pericardium, is actually acting as something of a tourniquet on Mr. Madril's heart. You heard that too that most of the blood was going into the chest cavity, some was coming out, but that was being absorbed mostly by the shirt at first.

Mr. Newmiller was convicted of second-degree murder with a deadly weapon and sentenced to thirty-one years' imprisonment.

### C. State Post-Conviction Proceedings

After the CCA affirmed Mr. Newmiller's conviction and sentence on direct ap-peal, Mr. Newmiller sought post-conviction relief in state court under Colorado Rule of Criminal Procedure 35(c).[2] Mr. Newmiller claimed, among other things, that his two trial counsel were ineffective under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). He argued trial counsel performed an insufficient pretrial investigation into how long Mr. Madril could have lived after being stabbed. If counsel had performed an adequate investigation, Mr. Newmiller maintained, they would have called Dr. Berson—whose opinions were known—to testify at trial and retained an expert in emergency medicine like Dr. David Glaser.

The state post-conviction court held a four-day evidentiary hearing, during which the court received into evidence the prosecution's report discussing its pretrial interview with Dr. Berson. The court also heard testimony from Dr. Glaser, Dr. Robert Bux, and Mr. Newmiller's trial counsel.

### 1. Dr. Berson

According to the report, Dr. Berson is a trauma specialist surgeon who has treated 500–700 trauma patients, including approximately 100 patients who have suffered stab wounds. Although Dr. Berson was called to the hospital when Mr. Madril arrived, Dr. Berson did not perform any surgical procedures because Mr. Madril was already deceased. But Dr. Berson did perform an ultrasound on Mr. Madril that showed Mr. Madril had a large amount of blood in his chest—about three to four liters of blood. A person of his size would typically have five or six liters of blood.

**2.** Colorado Rule of Criminal Procedure 35(c)(2)(I) provides that "every person convicted of a crime is entitled as a matter of right to make application for postconviction review" on the ground that "the conviction was obtained or sentence imposed in violation of the Constitution or laws of the United States."

In the underlying interview, Dr. Berson described Mr. Madril's wound and explained that someone who sustained that type of wound would bleed out more rapidly than someone with a smaller wound—where cardiac tamponade could occur. Dr. Berson stated that while people and injuries vary, "if the heart suffered a full wall breech ... the person would bleed out from between thirty seconds to a minute." He further noted that Mr. Madril's injury was "through the ventricle," and that a person who suffers a "full wall breech" would "pump out ... blood in the body [in] a very short time."

Dr. Berson next contrasted Mr. Madril's "long laceration" to a small wound or "pin prick" injury to the heart. He stated that, when the heart incurs a small wound, it bleeds into the pericardial sac that surrounds the heart. He explained that "[t]he blood flowing into the sac would compress the heart and impede it beating." But "in the case of a full wall breech ... the pericardial sac is also breached and does not contain the blood like it would in the case of a pin prick."

Dr. Berson also opined that the large wound Mr. Madril suffered would not necessarily have resulted in "the spurting of blood out of the body at the time of the wound," and that "he would not be surprised if the person doing the stabbing did not have much blood" on him. And when asked how long a person might stay on his feet after suffering a wound like Mr. Madril's, Dr. Berson stated "the victim could stay on his feet for approximately a minute or so." In contrast, when "[a]sked about the possibility of a person being on [his] feet after [suffering] a small puncture wound or the like, [Dr.] Berson stated a person could stay on [his] feet for quite a while." Finally, he said the amount of time a person could stay on his feet after being stabbed in the heart "would depend on the overall condition of the subject and what adrenaline [he] might have pumped."

## 2. Dr. Glaser

Mr. Newmiller also presented expert medical testimony from emergency physician Dr. Glaser, who had treated "a few hundred" stab wounds, including about a half-dozen stab wounds to the heart. Dr. Glaser testified that a patient's ability to survive a stab wound to the heart depends on several factors, such as "the depth and extent of the wound, the amount of blood loss, ... [and] how healthy [the patient was] to begin with." When asked if it is possible for a treating emergency room physician to estimate how long a deceased patient lived after being stabbed in the heart, Dr. Glaser responded, "I think in general; not because we don't do much in the way to the patient if they already come in dead."

Dr. Glaser then explained his understanding of cardiac (or pericardial) tamponade. He stated:

Pericardial tamponade occurs when fluid enters [the pericardial] sac and begins to squeeze the heart down to the point where blood, venous return from the body to the heart can't get into the heart anymore; and therefore, cardiac output drops meaning the amount of blood that your heart is pumping drops, and eventually people can die of that condition if it's not reversed.

Dr. Glaser next testified that cardiac tamponade would be evidenced by the presence of blood in the pericardium, by a wound to the heart that would have caused blood to enter the pericardium, and by a showing that the pericardium itself filled and compressed the heart.

Dr. Glaser opined that a large wound to the heart is less likely than a small wound to produce cardiac tamponade. Indeed, he averred that cardiac tamponade "can allow

a small wound to the heart to kill you in a reasonably short period of time after the injury," but that "it frankly just doesn't make sense . . . that [cardiac tamponade] would allow a large wound to not cause significant injury and keep you alive."

Dr. Glaser also reviewed photos taken at the autopsy and noted that Mr. Madril sustained "a large stab wound." Dr. Glaser agreed with Dr. Ritchey's finding that the weapon "entered the apex of the heart causing massive internal bleeding leading rapidly to death." But Dr. Glaser disagreed with Dr. Ritchey's opinion that it was "extremely likely" cardiac tamponade had occurred. Instead, Dr. Glaser opined that "this type of wound would be unlikely to cause pericardial tamponade." In fact, he opined with a "reasonable degree of medical probability" that cardiac tamponade did not occur in this case. And he explained "the whole notion of [cardiac] tamponade is that the wound has to be small enough that blood can be contained and pressure within that area can build up to compress the heart. In my opinion the size of this wound would prohibit that." Further, he said that nothing in the autopsy photos of Mr. Madril's heart indicated blood had pooled into his pericardium or that cardiac tamponade occurred in this instance.

Dr. Glaser also opined, based on his view of the autopsy photos and the size of the wound, that he "would be surprised if [Mr. Madril] survived more than a minute or two." But Dr. Glaser admitted it is not possible to know for sure how long someone with that type of wound would have survived and that it would depend on several factors. Importantly, Dr. Glaser acknowledged that Mr. Madril "could have maybe" initiated a fistfight with another individual, although "the size and extent of the wound would have not allowed for a prolonged fight." He added that "following

the first seconds to maybe half a minute or so, this injury would be causing loss of blood pressure, loss of profusion of blood to the brain, and the victim would pass out."

### 3. Dr. Bux

The prosecution called Dr. Bux as a rebuttal witness to Dr. Glaser. Dr. Bux testified Mr. Madril experienced some degree of cardiac tamponade that reasonably could have extended his life. *Newmiller*, 338 P.3d at 467. Contrary to Dr. Glaser's testimony, Dr. Bux stated that the cardiac tamponade could have allowed Mr. Madril to function for a couple of minutes or even longer. *Id.* But Dr. Bux acknowledged it is not possible to determine with any degree of scientific certainty how long a person might live or function after suffering a stab wound to the heart. *Id.* And he explained that survivability depends on a number of factors, of which cardiac tamponade is only one.

### 4. Trial Counsel

Mr. Newmiller's trial counsel, Ms. Grohs and Mr. Tate, also testified at the evidentiary hearing. Ms. Grohs had tried several homicide cases and had since become a state trial court judge. Mr. Tate had been a criminal defense attorney for fifteen years and he had tried five homicide cases.

As relevant, counsel testified that they met with Mr. Newmiller and his family several times, visited the crime scene on multiple occasions, hired an investigator, interviewed as many witnesses as they could, hired and later presented at trial a DNA expert, interviewed the doctors involved in the case, performed independent medical research, and consulted a confessions expert. Ms. Grohs also testified that she spent a great deal of time investigating whether Mr. Madril could have fought after being stabbed. For example, she

"read a lot of pathology books trying to find answers and treatises ... [with which she] could confront" Dr. Ritchey. She also interviewed Dr. Ritchey in person and consulted by telephone two independent forensic pathologists in connection with Dr. Ritchey's anticipated testimony. Ms. Grohs called one pathologist before she interviewed Dr. Ritchey and one after she interviewed Dr. Ritchey. Ms. Grohs described these telephone interviews as being "very serious and businesslike." During the calls, she provided each pathologist the facts of the case, but she did not provide them with any reports. Ms. Grohs explained she would have called a pathologist to testify at trial if one of them had disagreed with Dr. Ritchey. But all three said the same thing: it is possible for a person to engage in a fistfight for a short period of time after being stabbed in the heart.

As a result, Ms. Grohs and Mr. Tate decided to focus their efforts on the more problematic evidence, such as Mr. Newmiller's inculpatory statements and the traces of Mr. Madril's blood found on Mr. Newmiller's knife. And based on Mr. Newmiller's insistence that he did not stab Mr. Madril, their theory of defense was that Mr. Newmiller could not have stabbed Mr. Madril because he was nowhere near Mr. Madril during the altercation. According to the defense's version of events, Mr. Orgill committed the murder during his struggle with Mr. Madril near the end of the confrontation between the groups while Mr. Newmiller was slashing a tire on the opposite side of the pickup truck.

Last, Ms. Grohs testified that she and Mr. Tate reviewed the late-obtained discovery, including Dr. Berson's report. She acknowledged it would have been favorable to the defense if Dr. Berson's report contained facts that negated the theory Mr. Madril experienced cardiac tamponade.

And she conceded she could have attempted to call Dr. Berson at trial or request a continuance if his report was in fact favorable to the defense. But she explained "there wasn't anything in the [late-obtained] discovery that ... would have changed how we examined those witnesses" who had already testified. "I remember feeling lucky that the evidence came out the way that it did because I wasn't getting discovery and saying, oh, no, you know, I could have done this or something like that."

### D. The State Post-Conviction Court's Ruling

The state post-conviction court denied Mr. Newmiller's request for relief, finding neither deficient performance nor prejudice under *Strickland.* The court first found that Ms. Grohs and Mr. Tate are "highly experienced criminal defense attorneys" who "undertook a thorough investigation of the facts" and "carefully review[ed] the discovery." The court summarized the efforts taken by defense counsel and explained that "[c]ounsel devoted virtually full time to trial preparation for the three weeks preceding trial." Through those efforts, "counsel arrived at a theory of defense that the defendant never confronted the victim" or "got close enough to the victim to have stabbed him." The court also highlighted Ms. Grohs's pre-trial investigation to determine whether Mr. Madril could have fought Mr. Orgill after being stabbed in the heart. The court stated that Ms. Grohs did not consult medical experts in addition to the two forensic pathologists she interviewed "because she believed that the issue was one primarily of forensic pathology."

The court then concluded that defense counsel's failure to call Dr. Berson at trial or to ask for a continuance did not consti-

tute ineffective assistance of counsel under *Strickland*. The court explained:

> Assuming that Dr. Berson would have provided testimony to rebut the prosecution's evidence of cardiac tamponade, the more relevant issue was how long [Mr. Madril] could have functioned after receiving the stab wound, whether or not there was cardiac tamponade. Dr. Berson's potential testimony: "approximately a minute or so" was, as described below, within the same general time frames as those of Dr. Hertner and Dr. Glaser, and Dr. Ritchey. This time frame is also reasonably within the time frame of eyewitness descriptions of the fight between [Mr. Madril] and [Mr.] Orgill.

The court similarly concluded that defense counsel were not ineffective for failing to retain and/or present testimony from a medical expert such as Dr. Glaser. The court reasoned:

> [Ms.] Grohs researched the issue of survivability after [a] stab wound to the heart, she interviewed Dr. Ritchey in person and consulted two independent forensic pathologists in connection with Dr. Ritchey's anticipated testimony. Since all three said essentially the same thing, she did not believe that she could find [a] credible medical expert to rebut [Dr.] Ritchey. This level of investigation and her decision not to retain a medical expert clearly met the standard of reasonably competent assistance by an attorney acting as a diligent and conscientious advocate.

The court next turned to the prejudice prong of the *Strickland* test. After summarizing the testimony of Dr. Glaser and Dr. Bux, the court concluded there is no reasonable probability that the testimony of Dr. Glaser or Dr. Berson would have resulted in a different result at trial.

## E. The CCA's Decision

The CCA affirmed. In doing so, the CCA first agreed that trial counsel were "highly experienced criminal defense attorneys." *People v. Newmiller*, 338 P.3d 459, 463–64 (Colo. App. 2014). It then determined that the state post-conviction court's "conclusion that trial counsel's pretrial investigation regarding the medical evidence was reasonable is supported by the record." *Id.* at 468. The CCA explained the record supports the inference that counsel did not call a medical expert because they did not believe they could find a credible expert to rebut Dr. Ritchey. *Id.* And it found "the record shows that counsel had the requisite knowledge, or had consulted with experts to the degree necessary to acquire such knowledge, to understand the significance of the medical evidence and to competently cross-examine the prosecution's experts regarding the evidence." *Id.* The CCA therefore held "counsel's decision was strategic and adequately informed, and defendant has not overcome the 'virtually unchallengeable' presumption that counsel's decision was objectively reasonable." *Id.* (quoting *Bullock v. Carver*, 297 F.3d 1036, 1047 (10th Cir. 2002)).

The CCA next rejected the argument that counsel's performance was deficient because they failed to present exculpatory evidence. *Id.* The CCA reasoned:

> All the medical experts agreed that it is not possible to say for sure how long [Mr. Madril] lived after he had been stabbed. Had Dr. Berson been called and testified that [Mr. Madril] would have died within thirty seconds to a minute, the jury would have had to weigh that testimony against testimony by Dr. Ritchey and Dr. Hertner that it is not possible to definitively determine how long [Mr. Madril] could have survived. Consequently, what weight the

jury would have given such testimony is unclear.

Also, unlike the cases cited by [Mr. Newmiller] in which the evidence at issue could have determined the outcome of the case, other evidence that incriminated [Mr. Newmiller] existed that would not have been rebutted by favorable testimony on the medical evidence, such as [Mr. Newmiller's] statements about stabbing someone and [Mr. Madril's] blood on [Mr. Newmiller's] knife.

*Id.* Thus, the CCA agreed with the state post-conviction court that Mr. Newmiller did not establish his trial counsel's failure to call a medical expert constituted deficient performance under *Strickland. Id.* at 469. The CCA did not address the prejudice prong of the *Strickland* test.

### F. The Federal Petition

Mr. Newmiller initiated this federal habeas action in the United States District Court for the District of Colorado on November 6, 2015. Mr. Newmiller again argued that his counsel provided constitutionally inadequate representation under *Strickland.* The district court denied relief. In doing so, the district court observed it was "[o]f critical importance ... whether [Mr.] Madril had the physical ability to engage in that fight [with Mr. Orgill] after sustaining a knife wound that breached the wall of a ventricle in his heart." The court then stated that although the prosecution provided defense counsel the discovery materials containing Dr. Berson's report "before the trial started," "[t]hey were not examined until March 7, 2016, while the trial was in progress." The court ruled:

The failure of defendant's counsel to obtain and review the prosecution's disclosure before trial was unreasonable and resulted in a failure to present contradictory expert opinions on the initial question of where the stabbing occurred.

The witnesses all agreed that they never saw the defendant and victim standing close together and did not see that [Mr.] Newmiller had an open knife.

In fact, [Mr.] Tate in his argument suggested the implausible theory that [Mr.] Madril stabbed himself with his own knife when he fought with [Mr.] Orgill as well as [Mr.] Orgill doing the stabbing with some knife that he discarded. He also argued blood stains location. The lack of focus on the issue of temporal survival after this type of wound illustrates the failure of defense counsel to develop the most obvious defense— that [Mr.] Madril could not engage in the fight with [Mr.] Orgill after being stabbed in the heart.

The court explained in a later clarification order that it had ruled "trial counsels' [sic] failure to review the discovery material available to them and prepare to contradict the medical opinions presented by the prosecution was deficient performance and the [CCA's] ruling to the contrary was an unreasonable application of *Strickland.*"

The court then observed that while the CCA did not address the prejudice prong of the *Strickland* test, the state post-conviction court did address it, ruling that defense counsel's failure to call a medical witness was not prejudicial. The court deferred to the state post-conviction court's ruling that Mr. Newmiller failed to show prejudice.

Finally, the court granted Mr. Newmiller a certificate of appealability, finding that jurists of reason could disagree with the court's resolution of the *Strickland* claim. Mr. Newmiller now appeals.

## II. LEGAL STANDARDS

Before analyzing the reasonableness of the CCA's decision, we first provide (A) the standard of review, (B) an overview of the federal statute governing habeas relief,

and (C) a summary of the *Strickland* standard for ineffective-assistance-of-counsel claims.

### A. *Standard of Review*

■ We review the district court's "legal analysis of the state court decision *de novo* and its factual findings, if any, for clear error." *Smith v. Duckworth*, 824 F.3d 1233, 1241–42 (10th Cir. 2016) (internal quotation marks omitted). We may affirm "on any basis supported by the record." *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011).

### B. *AEDPA*

■ The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) requires us to apply a "difficult to meet and highly deferential standard" in federal habeas proceedings under 28 U.S.C. § 2254, one that "demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011) (internal quotation marks omitted). When a petitioner includes in his habeas corpus application a "claim that was adjudicated on the merits in State court proceedings," a federal court shall not grant relief on that claim under § 2254 unless the state-court decision:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

§ 2254(d)(1)–(2).

■ Section 2254(d)(1)'s reference to "clearly established Federal law, as determined by the Supreme Court of the United States" "refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). "Federal courts may not extract clearly established law from the general legal principles developed in factually distinct contexts, and Supreme Court holdings must be construed narrowly and consist only of something akin to on-point holdings." *Fairchild v. Trammell*, 784 F.3d 702, 710 (10th Cir. 2015) (internal quotation marks omitted).

■ Under § 2254(d)(1), a state-court decision is "contrary to" the Supreme Court's clearly established law if it "applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [that] precedent." *Williams*, 529 U.S. at 405, 406, 120 S.Ct. 1495. A state court need not cite, or even be aware of, applicable Supreme Court decisions, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam).

■ ▪A state-court decision is an "unreasonable application" of clearly established Supreme Court law if the decision "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Williams*, 529 U.S. at 407–08, 120 S.Ct. 1495. Although the term "unreasonable" is "difficult to define," "it is a common term in the legal world and ... federal judges are familiar with its meaning." *Id.* at 410, 120 S.Ct. 1495. We undertake this objective unreasonableness inquiry in view of the specificity of the governing rule: "The more general the rule, the more leeway

courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). Conversely, "[i]f a legal rule is specific, the range may be narrow" and [a]pplications of the rule may be plainly correct or incorrect." *Id.* Also, "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams*, 529 U.S. at 410, 120 S.Ct. 1495. As a result, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly"; "that application must also be unreasonable." *Id.* at 411, 120 S.Ct. 1495. Even when the state court does not explain its decision, the petitioner must still show that "there was no reasonable basis for the state court to deny relief." *Harrington v. Richter*, 562 U.S. 86, 98, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011). "[A] habeas court must determine what arguments or theories supported or … could have supported[ ] the state court's decision." *Id.* at 102, 131 S.Ct. 770. And "then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the] Court." *Id.*; *see also id.* at 101, 131 S.Ct. 770 ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." (internal quotation marks omitted)); *id.* at 102, 131 S.Ct. 770 ("[AEDPA] preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the] Court's precedents."). Thus, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102, 131 S.Ct. 770.

The Court has "emphasize[d] that review under § 2254(d)(1) focuses on what a state court knew and did." *Pinholster*, 563 U.S. at 182, 131 S.Ct. 1388. To that end, we measure a state court's decision against the "Court's precedents as of the time the state court renders its decision." *Id.* (internal quotation marks omitted). And we limit our review "to the record that was before the state court that adjudicated the claim on the merits." *Id.* at 181, 131 S.Ct. 1388. The Court has also stated § 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington*, 562 U.S. at 102–03, 131 S.Ct. 770 (internal quotation marks omitted). Thus, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103, 131 S.Ct. 770. "If [it seems like] this standard is difficult to meet, that is because it was meant to be." *Id.* at 102, 131 S.Ct. 770. At all times, "[t]he petitioner carries the burden of proof." *Pinholster*, 563 U.S. at 181, 131 S.Ct. 1388.

### C. Strickland

To determine whether a petitioner's trial counsel was ineffective, we apply the ineffective-assistance-of-counsel standard articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "The benchmark for judging any claim of ineffectiveness [is] whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686, 104 S.Ct. 2052.

■ A petitioner must satisfy a two-part test to obtain relief under *Strickland*. First, he must show that his counsel's performance was deficient, i.e., "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687, 104 S.Ct. 2052. In undertaking this inquiry, we must begin with a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and that "the challenged action might be considered sound trial strategy." *Id.* at 689, 104 S.Ct. 2052 (internal quotation marks omitted). "There are countless ways to provide effective assistance in any given case." *Id.* And "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Id.*

■ To rebut the presumption, the petitioner must show "counsel's representation fell below an objective standard of reasonableness" under the circumstances and "prevailing professional norms." *Id.* at 688, 104 S.Ct. 2052; *see also Bullock v. Carver*, 297 F.3d 1036, 1046 (10th Cir. 2002) (stating the "ultimate question . . . is whether counsel performed in an objectively reasonable manner"). Even in circumstances where an attorney erred, "[i]t will generally be appropriate for a reviewing court to assess counsel's overall performance throughout the case in order to determine whether the 'identified acts or omissions' overcome the presumption that a counsel rendered reasonable professional assistance." *Kimmelman v. Morrison*, 477 U.S. 365, 386, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986); *see Harrington*, 562 U.S. at 111, 131 S.Ct. 770 ("[W]hile in some instances even an isolated error can support an ineffective-assistance claim if it is sufficiently egregious and prejudicial, it is difficult to establish ineffective assistance when counsel's overall performance indi-

cates active and capable advocacy." (internal quotation marks omitted)).

■ No "set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Strickland*, 466 U.S. at 688–89, 104 S.Ct. 2052. But counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691, 104 S.Ct. 2052. A "decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* "[W]hat investigation decisions are reasonable depends critically" on "information supplied by the defendant." *Id.* For instance, "the need for further investigation may be considerably diminished or eliminated altogether" if counsel develops a certain line of defense based on what the defendant has said. *Id.*; *see also Bryan v. Mullin*, 335 F.3d 1207, 1219 (10th Cir. 2003) (en banc) ("Although trial counsel has an independent duty to investigate and make a case in defense, counsel also has to be responsive to the wishes of his client." (internal quotation marks omitted)).

■ Relatedly, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052; *see also Bullock*, 297 F.3d at 1047 (stating that strategic or tactical choices "are presumed correct, unless they were completely unreasonable, not merely wrong" (internal quotation marks omitted)). But strategic decisions "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466

U.S. at 690–91, 104 S.Ct. 2052. "[F]or example, even though counsel's strategy was ill-informed and thus does not qualify for the virtually unchallengeable presumption of reasonableness, a court reviewing the record before it might still conclude that counsel performed in an objectively reasonable manner." *Bullock*, 297 F.3d at 1046.

 In the end, our "scrutiny of counsel's performance [is] highly deferential" and undertaken without "the distorting effects of hindsight." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. "It is all too tempting for a defendant to second-guess counsel's assistance after conviction." *Id.* And "it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.*; *see also Bullock*, 297 F.3d at 1048 (stating "the Sixth Amendment does not guarantee an errorless trial, and prevailing professional norms do not require perfection at trial" (internal quotation marks omitted)). Thus, every effort must be made to "reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052.

 Second, a petitioner must show counsel's deficient performance "prejudiced the defense," i.e., "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687, 104 S.Ct. 2052. The petitioner must establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052. Thus, "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695, 104 S.Ct. 2052. "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112, 131 S.Ct. 770.

 "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Id.* at 105, 131 S.Ct. 770. Both standards are "highly deferential," *id.* (internal quotation marks omitted), making our review of an ineffective-assistance claim "doubly deferential" in that we "take a highly deferential look at counsel's performance through the deferential lens of § 2254(d)," *Pinholster*, 563 U.S. at 190, 131 S.Ct. 1388 (internal quotation marks omitted). Further, "[t]he *Strickland* standard is a general one, so the range of reasonable applications is substantial." *Harrington*, 562 U.S. at 105, 131 S.Ct. 770. Thus, the inquiry "is not whether counsel's actions were reasonable." *Id.* It is "whether there is *any reasonable argument* that counsel satisfied *Strickland*'s deferential standard." *Id.* (emphasis added); *see also id.* at 102, 131 S.Ct. 770 (stating that "a habeas court must determine what arguments or theories supported or . . . could have supported[ ] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court").

## III. DISCUSSION

Mr. Newmiller claims his trial counsel provided deficient performance when they (1) failed to adequately investigate before trial and call during trial a medical expert, such as Dr. Glaser, to rebut the prosecution's experts, and (2) failed to call Dr. Berson to testify after reviewing the excul-

patory report of his interview during trial. The district court concluded that the CCA unreasonably applied *Strickland.* But the court denied relief because Mr. Newmiller failed to show he was prejudiced by counsel's performance. While we affirm the district court's judgment, we do so on other grounds. As we now explain, the CCA reasonably applied *Strickland* when it held that trial counsel performed an adequate investigation and did not perform deficiently by declining to call Dr. Berson to testify.

## A. *Pretrial Investigation*

Mr. Newmiller contends his trial counsel deficiently performed by failing to adequately consult with and call a medical expert who could have rebutted the prosecution's theory that Mr. Newmiller fatally stabbed Mr. Madril at the beginning of the confrontation and that Mr. Madril lived long enough after being stabbed to engage in a fistfight with Mr. Orgill. We conclude it is at least arguable that trial counsel performed an adequate pretrial investigation and reasonably declined to call a medical expert, such as Dr. Glaser, to testify at trial. *See Harrington,* 562 U.S. at 105, 131 S.Ct. 770 (stating the question when applying *Strickland* under § 2254(d) is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard").

■■■■■ As discussed above, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690, 104 S.Ct. 2052. For example, trial counsel's informed decision not to call a particular witness is a tactical decision and thus a matter of discretion for counsel. *See Ellis v. Raemisch,* 872 F.3d 1064, 1087 (10th Cir. 2017). But strategic decisions made after less than a complete investigation are reasonable only "to the extent that reasonable professional judgments support the limitations on investigation." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. We assess a decision not to investigate for "reasonableness" under the circumstances, "applying a heavy measure of deference to counsel's judgments." *Id.* "[W]hat investigation decisions are reasonable depends critically" on "information supplied by the defendant." *Id.* For instance, the Supreme Court has recognized that "the need for further investigation may be considerably diminished or eliminated altogether" if counsel develops a certain line of defense based on what the defendant has said. *Id.* In the end, the question is whether counsel's actions were objectively reasonable. *Id.* at 688, 104 S.Ct. 2052.

■■■■■ Here, the CCA reasonably concluded that Mr. Newmiller's counsel—Mr. Tate and Ms. Grohs—made a reasonable strategic decision after performing an adequate investigation and consultation with their client. As counsel prepared for trial, "there were any number of hypothetical experts ... whose insight might possibly have been useful." *Harrington,* 562 U.S. at 107, 131 S.Ct. 770. They could have consulted specialists in crime-scene reconstruction, confessions, DNA, serology, trauma, emergency medicine, and forensic pathology. Counsel recognized this, as they interviewed the doctors involved in the case, consulted a confessions expert, and hired and later presented at trial a DNA expert.

Ms. Grohs also investigated whether Mr. Madril could have fought Mr. Orgill after being fatally stabbed in the heart. Ms. Grohs read several pathology books and treatises in preparation for her in-person

interview with Dr. Ritchey. And she consulted two independent forensic pathologists—one before interviewing Dr. Ritchey and one after interviewing him. While Ms. Grohs testified she would have called a pathologist to testify at trial if one of them had disagreed with Dr. Ritchey, both pathologists agreed with Dr. Ritchey that it is possible for a person to engage in a fistfight for a short period after being stabbed in the heart.

Based on this investigation and on Mr. Newmiller's insistence that he did not stab Mr. Madril (as opposed to stabbing him in self-defense), counsel decided their theory of defense would be that Mr. Newmiller could not have stabbed Mr. Madril because he was nowhere near Mr. Madril during the altercation, and that Mr. Orgill must have stabbed Mr. Madril during their fistfight. To that end, counsel decided that instead of consulting a third or fourth pathologist—or calling one of the pathologists Ms. Grohs consulted—they would focus their efforts on defending against the confessions implicating Mr. Newmiller and the small amount of Mr. Madril's blood found on Mr. Newmiller's knife.

■ Under these circumstances, it is at least arguable a reasonable attorney would abandon further investigation into whether Mr. Madril could have engaged in a fistfight after being stabbed, and instead focus on the other problematic evidence in accord with the defense's theory and the defendant's statements. After all, counsel need not pursue an investigation that, without the benefit of hindsight, would be fruitless and a drain on limited resources. *Harrington*, 562 U.S. at 107–08, 131 S.Ct. 770; *see also Strickland*, 466 U.S. at 689, 104 S.Ct. 2052 (stressing that "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time").

To be sure, counsel's defense strategy was ultimately unsuccessful. But that does not mean their representation was so obviously deficient that the CCA's holding to the contrary is unreasonable. *See Harrington*, 562 U.S. at 109, 131 S.Ct. 770; *see also Strickland*, 466 U.S. at 689, 104 S.Ct. 2052 ("Judicial scrutiny of counsel's performance must be highly deferential," for "it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."). We conclude the CCA reasonably held that counsel's decision to not investigate further or call an expert to rebut Dr. Ritchey's testimony was strategic and adequately informed, and that Mr. Newmiller did not overcome the resulting and virtually unchallengeable presumption that counsel's decision was objectively reasonable.

■ Mr. Newmiller launches several attacks on the CCA's decision. First, he argues that Ms. Grohs's calls with the two pathologists were "woefully inadequate" and not expert "consultations" in any meaningful sense. He notes that Ms. Grohs shared only the facts of the case with each pathologist, without providing them with any medical reports. Mr. Newmiller maintains that had Ms. Grohs shown actual photographs and autopsy reports to an emergency physician such as Dr. Glaser, she would have learned that a wound as large as the one Mr. Madril sustained is unlikely to cause cardiac tamponade. But Mr. Madril's ability to function long enough to engage in a fistfight was not dependent upon a predicate finding that he experienced cardiac tamponade. Indeed, the focus at trial was not on whether Mr. Madril experienced cardiac tamponade; it was on whether Mr. Madril could have survived for the short time the witnesses

reported he fought with Mr. Orgill. And every medical expert agreed that even in the absence of cardiac tamponade, Mr. Madril may have been able to fight for a brief period after the stabbing. Thus, Ms. Grohs provided the pathologists with sufficient information for them to arrive at a meaningful conclusion about a victim's ability to fight after being stabbed in the heart. Further, neither *Strickland* nor any other clearly established Supreme Court law requires a particular method of consultation. *See Strickland*, 466 U.S. at 688–89, 104 S.Ct. 2052 ("No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel.").

Second, Mr. Newmiller insists that his case was one of those rare cases "where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence, whether pretrial, at trial, or both." *Harrington*, 562 U.S. at 106, 131 S.Ct. 770. But Ms. Grohs did *consult* with experts concerning a victim's ability to fight after being stabbed in the heart. Thus, Mr. Newmiller seems to contend that his counsel was required to *introduce* expert testimony to rebut the prosecution's expert testimony that Mr. Madril was able to fight Mr. Orgill because Mr. Madril suffered cardiac tamponade after being stabbed. In support, Mr. Newmiller cites *Paine v. Massie*, 339 F.3d 1194 (10th Cir. 2003). In *Paine*, we held that counsel performed deficiently under the applicable standard of care because he failed to call an expert despite asserting a defense that the state courts had held requires calling an expert. *See id.* at 1202 (holding that counsel was ineffective for failing to call an expert on battered woman syndrome because "the professional standard in Oklahoma for an attorney representing a battered woman claiming self-defense" requires counsel, under the state's case law, to "put on an expert to

explain [battered woman syndrome] to the jury"). But Mr. Newmiller cites no law requiring counsel to call a medical expert in this situation. Absent such authority, "*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense." *Harrington*, 562 U.S. at 111, 131 S.Ct. 770.

 Third, in an attempt to sidestep the virtually unchallengeable presumption that counsel's strategic decision was reasonable so long as it was adequately informed, Mr. Newmiller argues that counsel's decision to forego retaining and calling a medical expert was not actually a strategic decision. A state court's finding that an attorney's actions were the product of a strategic decision is a question of fact that must be rebutted by clear and convincing evidence under 28 U.S.C. § 2254(e)(1). *See Bryan v. Mullin*, 335 F.3d 1207, 1221 n.17 (10th Cir. 2003).

In support of this argument, Mr. Newmiller contends that expert testimony refuting the prosecution's theory of how long Mr. Madril could stand and fight would have supported the defense's strategy of showing that Mr. Newmiller could not have stabbed Mr. Madril. But even if it might have been helpful to introduce such expert testimony, it is arguable that a reasonable attorney might elect not to do so in view of the possibility that such testimony could harm the defense. *See Harrington*, 562 U.S. at 108, 131 S.Ct. 770 (stating that, even if expert testimony might support a defense, it is "reasonable to conclude that a competent attorney might elect not to use it" because it "might be harmful to the defense"). For instance, calling an expert on cardiac tamponade may have served only to highlight what

every expert in this case agrees: that Mr. Madril could have functioned long enough to at least initiate a fight with Mr. Orgill. Or it could have drawn undue attention to whether cardiac tamponade occurred, even though the real issue was whether Mr. Madril could have fought Mr. Orgill after being stabbed in the heart—an issue that depends on a number of factors, of which cardiac tamponade is only one. Aside from these dangers, it could have unnecessarily converted the case into a battle of the experts. *See id.* at 108–09, 131 S.Ct. 770 (stating a competent attorney could decline to use expert testimony where it could "transform the case into a battle of the experts").

Mr. Newmiller further argues that clear and convincing evidence exists to overcome the presumption that counsel's decision to forego retaining and calling a medical expert was a strategic decision. He cites Ms. Grohs's testimony that she would have called a pathologist to testify at trial if one of the pathologists with which she consulted disagreed with Dr. Ritchey. Mr. Newmiller contends her testimony shows her failure to present medical expert testimony was not a strategic weighing of pros and cons of presenting such evidence, but instead a product of Ms. Grohs's inadequate consultation and investigation. But the testimony actually establishes the opposite. Because Ms. Grohs could not find an expert willing to contradict Dr. Ritchey's opinion, Ms. Grohs decided to focus her limited resources on attacking Mr. Newmiller's alleged confessions and providing an explanation for the traces of Mr. Madril's blood found on Mr. Newmiller's knife. That is, in view of the information available to her, Ms. Grohs made a strategic decision to focus her efforts on pursuing another theory of defense. It is at least arguable that this choice falls within the wide range of reasonable professional assistance.

Finally, the district court concluded that counsel was deficient because they failed to focus on "the most obvious defense" in the case—the "issue of temporal survival after this type of wound." The district court then determined that any conclusion otherwise constitutes an unreasonable application of *Strickland.* From our vantage point, it does not appear the district court afforded appropriate deference to the state court's determination—deference that requires a federal court to ask "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington,* 562 U.S. at 105, 131 S.Ct. 770. Indeed, it is unclear how the district court's analysis would have been different without AEDPA's standard of review.

It was within the bounds of a reasonable judicial determination for the CCA to hold that counsel could follow a trial strategy that did not require the use of medical experts concerning the victim's ability to engage in a fight after being stabbed in the heart. This is particularly true where the two experts and the medical textbooks defense counsel consulted all agreed that in such circumstances death might not have occurred instantly.

## B. Dr. Berson

Mr. Newmiller next argues that counsel were deficient for failing to call Dr. Berson to testify after they read his report midtrial. Recall that the prosecution made available on February 28, 2006, the day jury selection started, the discovery materials containing Dr. Berson's report. Due to a miscommunication within Mr. Tate's office, defense counsel did not obtain and review the materials until March 7, 2016, the fifth day of witness examination and after Dr. Hertner and Dr. Ritchey had testified. After reviewing these materials,

including Dr. Berson's report, counsel decided against calling Dr. Berson to testify and did not request a continuance.

Mr. Newmiller does not contend that counsel performed deficiently solely because of their late review of Dr. Berson's report. He instead argues the decision to not call Dr. Berson or to seek a continuance constitutes deficient performance. Relying on *Duncan v. Ornoski*, 528 F.3d 1222 (9th Cir. 2008), and *Woolley v. Rednour*, 702 F.3d 411 (7th Cir. 2012), Mr. Newmiller claims Dr. Berson's report rebutted the prosecution's theory that Mr. Madril experienced cardiac tamponade and therefore provided exculpatory evidence. We conclude it is arguable that competent counsel would strategically decline to call Dr. Berson to testify because his report was not exculpatory.

In *Duncan*, a pre-AEDPA case that the Ninth Circuit reviewed de novo, the court acknowledged the Supreme Court has declined to articulate specific guidelines governing attorney conduct. 528 F.3d at 1233–34. But because AEDPA—and its focus on clearly established Supreme Court law—did not apply, the court applied one of its own "established general principles" governing the reasonableness of attorney conduct. *Id.* at 1234. Under that Ninth Circuit principle, an attorney who fails to introduce exculpatory evidence—"evidence that demonstrates his client's factual innocence, or that raises sufficient doubt as to that question to undermine confidence in the verdict[—]renders deficient performance." *Id.* (internal quotation marks omitted) The court explained that although "it may not be necessary in every instance to consult with or present the testimony of an expert, when the prosecutor's expert witness testifies about pivotal evidence or directly contradicts the defense theory, defense counsel's failure to present expert testimony on

that matter may constitute deficient performance." *Id.* at 1235.

Applying this principle, the court held that defense counsel was deficient for failing to consult an expert concerning "potentially exonerating blood evidence" and for failing to present such evidence at trial. *Id.* at 1235–36. To obtain a conviction, the prosecution had to show that defendant himself intentionally killed the victim or that defendant intended that the victim be killed by an accomplice. *Id.* at 1233. Defense counsel's theory was that someone other than defendant committed the murder. *Id.* Yet counsel "did not advance any plausible alternative theory or present any specific evidence that he was not the murderer," even though there was blood sample evidence before the jury that could have shown defendant did not kill the victim. *Id.* at 1235. Counsel had a copy of the police serology report. *Id.* But he did not consult a serology expert, have defendant's blood tested, or present the results of any such tests at trial. *Id.* According to the Ninth Circuit, this failure amounted to deficient performance. *Id.*

The present case is distinguishable from *Duncan*. First, this case is governed by AEDPA, meaning we may not grant relief unless the state court's decision was contrary to, or an unreasonable application of, clearly established Supreme Court law. § 2254(d)(1). It is not enough that the state court's decision may be contrary to, or an unreasonable application of, clearly established Tenth Circuit law. Thus, unlike the Ninth Circuit in *Duncan*, we are not free to rely on our own case law to supply the applicable standard of care; we must instead adhere to the Supreme Court's rule that there are no specific guidelines governing attorney conduct. Second, Ms. Grohs consulted two expert pathologists to discern whether Mr. Madril could have fought Mr. Orgill after being fatally

stabbed in the heart. Both experts agreed with Dr. Ritchey that it is possible for a person to engage in a fistfight for a short period after being stabbed in the heart. Third, counsel advanced a plausible alternative theory and presented evidence that Mr. Newmiller was not the murderer. Counsel sought to challenge the confessions implicating Mr. Newmiller and the blood found on his knife. And counsel endeavored to persuade the jury that Mr. Orgill stabbed Mr. Madril (or that Mr. Madril stabbed himself) during their fistfight, and that he did so while Mr. Newmiller was slashing the tire at the opposite end of the vehicle. Fourth, as discussed below, Dr. Berson's report was not necessarily exculpatory.

This case is also distinguishable from the Seventh Circuit's decision in *Woolley*. There, applying de novo review, the court held that defense counsel was deficient for failing to retain an expert to challenge "impeachable testimony" from the prosecution's expert crime-scene investigator that "effectively hollowed out the core of his client's defense." 702 F.3d at 422–23. Counsel knew his client's testimony turned on the location of the final gunshot, and he had advance notice that the prosecution planned to introduce expert testimony on that issue. *Id.* at 423. Yet he made no effort to retain an expert. *Id.* And it was "undisputed that there was no strategic rationale underlying" that error: counsel testified that "the idea of securing an expert witness 'never crossed my mind.'" *Id.*

 But again, our task is not to determine in the first instance whether defense counsel was deficient; it is to determine "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105, 131 S.Ct. 770. Moreover, the idea of retaining an expert crossed Ms. Grohs's mind. In fact, she took steps

to retain an expert: she interviewed two forensic pathologists, yet strategically decided against calling either to testify. Plus, this case did not turn on whether Mr. Madril experienced cardiac tamponade. The real issue was whether Mr. Madril could have engaged in a fistfight after being fatally stabbed in the heart. When both experts she consulted agreed that Mr. Madril could have stood and fought as described by the witnesses, Ms. Grohs made the reasonable strategic decision to focus on the damning confessions evidence and the blood found on Mr. Newmiller's knife.

More importantly, neither Dr. Berson's nor Dr. Glaser's testimony necessarily would have rebutted the testimony from the prosecution's experts. All the experts agreed that several factors influence how long a victim can stay on his feet after being stabbed in the heart, of which cardiac tamponade is only one. And there was a general consensus that the victim could have engaged in a fistfight for a short period after being stabbed. Dr. Ritchey testified that while he had "no way of knowing" how long Mr. Madril lived after being stabbed, he believed a person could die from a wound like that sustained by Mr. Madril in anywhere from "a few seconds to a few minutes"; Dr. Berson stated that the amount of time a person could stay on his feet after being stabbed in the heart depends on several factors, but that a person might stay on his feet after suffering a wound like Mr. Madril's for "approximately a minute or so"; and Dr. Glaser testified at the state post-conviction hearing that although he "would be surprised if [Mr. Madril] survived more than a minute or two," Mr. Madril "could have maybe" initiated a fistfight with another person. Even if Dr. Berson's or Dr. Glaser's testimony would have rebutted some of the testimony from the prosecution's

experts, their testimony would not have been exculpatory. As the CCA observed, other evidence incriminating Mr. Newmiller existed that would not have been rebutted by favorable testimony from medical experts: Mr. Newmiller's confessions and the small amount of Mr. Madril's blood found on Mr. Newmiller's knife. *See Newmiller*, 338 P.3d at 468.

Finally, the district court concluded that "[t]he failure of defendant's counsel to obtain and review the prosecution's disclosure before trial was unreasonable and resulted in a failure to present contradictory expert opinions" on when the stabbing occurred. But Mr. Newmiller did not argue in state court that his counsel performed deficiently by delaying a week in obtaining the prosecution's discovery. Even so, the delay did not cause counsel's failure to present contradictory expert opinions. Counsel reviewed the discovery, including Dr. Berson's report, and decided against calling Dr. Berson after concluding the new materials did not affect how they would have examined any of the witnesses, including Dr. Ritchey. It is at least arguable that this decision was a reasonable strategic move.

Under the circumstances, the CCA reasonably held that competent counsel could strategically decline to call Dr. Berson to testify because his report was not exculpa-tory. Thus, we conclude that the CCA did not unreasonably apply *Strickland*.

## IV. CONCLUSION

The CCA's holding that Mr. Newmiller's ineffective-assistance-of-counsel claim fails under step one of *Strickland* was not an unreasonable application of *Strickland*. Thus, we need not reach step two under *Strickland*.[3] *See Ellis*, 872 F.3d at 1085 ("In order to succeed on an ineffective-assistance claim, a petitioner must satisfy both prongs of the *Strickland* test."). We affirm the district court's judgment denying Mr. Newmiller habeas relief.

---

3. Although we need not reach the prejudice prong under *Strickland*, we note that, in deferring to the state post-conviction court's analysis of that prong, the district court focused on "the sufficiency of the other evidence of guilt." But prejudice under *Strickland* does not turn on a sufficiency-of-the-evidence analysis. Rather, to establish prejudice, a petitioner must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. As our sister circuits have recognized, whether there was enough evidence to legally support a conviction does not answer whether there was a reasonable probability of a different result arising from counsel's deficient performance. *See Crace v. Herzog*, 798 F.3d 840, 849 (9th Cir. 2015) (stating that the prejudice test under *Strickland* is "an entirely different inquiry" from the sufficiency-of-the-evidence test); *Saranchak v. Sec'y, Pa. Dep't of Corr.*, 802 F.3d 579, 599 (3d Cir. 2015) ("*Strickland* prejudice does not depend on the sufficiency of the evidence despite counsel's mistakes.").